229 Cal.App.3d 769 (1991)
282 Cal. Rptr. 303
In re JESSICA F., a Person Coming Under the Juvenile Court Law.
SAN BERNARDINO COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent,
v.
DELORES F., Defendant and Appellant.
Docket No. E008074.
Court of Appeals of California, Fourth District, Division Two.
April 24, 1991.
*771 COUNSEL
Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.
Alan K. Marks, County Counsel, and Linda C. Stern, Deputy County Counsel, for Plaintiff and Respondent.
James R. Bostwick, Jr., under appointment by the Court of Appeal, for Minor.
[Opinion certified for partial publication.[*]]
OPINION
McKINSTER, J.
This is an appeal by mother from the judgment declaring her then nearly four-year-old daughter, Jessica, a dependent of the court and, further, removing Jessica from mother's custody. In declaring Jessica a dependent, the trial court found, among other things, that mother's nolo contendere plea to felony child endangerment (Pen. Code, § 273a, subd. (1)), entered pursuant to a plea bargain on an original charge of murder (Pen. Code, § 187), constituted a conviction for causing the death of mother's then 22-month-old son through abuse or neglect, within the meaning of Welfare and Institutions Code section 300, subdivision (f). We conclude that this finding, and each of the other findings and orders challenged by mother in this appeal, was proper and, therefore, we shall affirm the judgment.

SUMMARY OF FACTS
Jessica, then approximately eight months old, was removed from mother's custody on March 5, 1987, after the death of Jessica's twenty-two-month-old *772 brother, Matthew, on March 1, 1987. Police investigation of Matthew's death revealed that Matthew had been strangled. According to mother's statements to the police following Matthew's death, Matthew died while at home in the care of a friend who was babysitting both Matthew and Jessica while mother went out to run a few errands. Specifically, mother told the police that she left Matthew and Jessica, both of whom had colds, at home with a friend while mother went out for several hours. Mother told the police that she gave Matthew a bottle and put him down for a nap about 11 a.m., an hour before she left the house. Just before leaving, around noon, mother said she went into Matthew's room, removed the baby bottle from the crib where Matthew was sleeping, and she did not check on Matthew again until she returned home approximately four hours later.[1]
Mother told the police that she found Matthew hanging from the left side of his crib, on the outside, suspended, apparently under the chin and around the neck, by a red cord mother had tied on to Matthew's pacifier.[2] Mother lifted Matthew off the left corner piece of the crib on which the cord purportedly was caught. According to mother, Matthew's legs were blue and stiff. While mother tried to revive Matthew, the baby-sitter dialed 911. Paramedics arrived and took Matthew to Doctor's Hospital in Montclair where Matthew was pronounced dead, the time of death estimated to be between noon and 2 p.m. Although Matthew previously had never climbed out of his crib, mother was of the opinion that Matthew strangled himself on the pacifier cord, which caught on the crib while Matthew apparently was trying to climb out.
The day after Matthew's death, Jessica was admitted to the hospital suffering from pneumonia. While Jessica remained in the hospital, the police continued to investigate the circumstances surrounding Matthew's death. The investigation included an interview with the baby-sitter, whose statement conflicted with mother's statement. According to the baby-sitter, contrary to mother's original statement, which mother later corrected, as above noted, mother did not check on Matthew when she returned home the first time. Mother remained home for approximately an hour and one-half after first returning, during which time mother talked on the telephone, while doing her makeup and nails. Just before leaving the second time, the baby-sitter walked outside with mother to get some beer mother had in the *773 car. The baby-sitter went back in the house with the beer and did not see mother again for approximately half an hour. When mother returned home this second time, she talked with the baby-sitter and attended to Jessica. It was not until the baby-sitter pointed out that Matthew had been asleep for a long time that mother went in to check on him. According to the baby-sitter, after mother went into Matthew's room, the baby-sitter heard mother yell Matthew's name and then yell for baby-sitter. The baby-sitter ran into the room where she saw Matthew lying on the floor, face up and legs spread apart. The baby-sitter described mother as "extremely excited and yelling for help while dialing 911." After completing the 911 call, mother moved Matthew from the bedroom to the living room where she attempted to administer CPR, but mother was unable to open Matthew's mouth.
The police examination of Matthew's bedroom revealed that there were undisturbed particles of dust on the crib at the location where mother said Matthew's pacifier cord had caught. In addition, the investigating officer noted, based on his initial inspection, that the weave pattern of the pacifier cord fabric did not match the weave pattern of the cord marks on Matthew's neck. The report of the autopsy, conducted the day after Matthew died, revealed that Matthew had, in fact, hanged to death. Dr. Root, the autopsy surgeon, confirmed the investigating officer's conclusion that the weave pattern on the pacifier cord did not match the pattern of the cord marks on Matthew's neck. Additionally, if the pacifier had been in front on Matthew's neck, as mother claimed it was when she found Matthew, there would have been marks on Matthew's neck caused by the pacifier, separate and distinct from the cord-like markings which were the only marks actually found. Dr. Root also confirmed, based on rigor mortis in Matthew's extremities, that Matthew died three to four hours before mother called the paramedics and Matthew was taken to the hospital. Dr. Root's autopsy report also revealed that Matthew had facial and scalp contusions, acetaminophen and pseudoephedrine (substances commonly found in over-the-counter cold medications) toxicity and chronic laryngo-tracheo-bron-chopneumonitis.
The investigating officer also re-created mother's description of how Matthew was hanging when mother found him. Matthew, according to the officer's measurement of the body, was 36 inches tall. The portion of the crib where mother said the pacifier cord was caught was approximately 38 inches from the floor. Adding the 10 inches of the pacifier cord to Matthew's height of 36 inches, Matthew would have been standing on the floor, even if the pacifier cord had caught on the crib.
In light of the foregoing evidence, combined with the discrepancies between mother's statement and that of the baby-sitter, the police and child *774 protective services (CPS) considered the circumstances of Matthew's death to be suspicious. As a result, the police, at the request of CPS, placed a protective custody hold on Jessica, while she was still in the hospital recovering from pneumonia, to prevent the hospital from releasing Jessica to mother or anyone other than CPS. Although mother originally wanted Jessica released to the custody of Jessica's alleged natural father,[3] mother and father ultimately agreed that mother's cousin and his wife would care for Jessica during what eventually became a homicide investigation of mother for the death of Matthew. Thus, on March 6, 1987, Jessica was released from the hospital to the custody of mother's cousin, in whose custody Jessica remained at all times relevant to the proceeding here in question.

PROCEDURAL BACKGROUND
On September 2, 1987, while the criminal investigation of mother's involvement in Matthew's death was still pending, the county department of public social services (DPSS) filed a petition regarding Jessica alleging dependency and jurisdiction pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (d).[4] In the petition, DPSS alleged, among other things, that mother currently was under investigation for murder in connection with the death of Matthew.[5] At the detention hearing on September 3, 1987, the trial court made the required findings for detention, placing Jessica in the temporary custody of DPSS and ordering that she remain with mother's cousin pending a contested jurisdiction hearing, which the trial court set for October 8, 1987.
The day before the October 8, 1987, contested jurisdiction hearing, mother was arrested for the murder of Matthew.[6] In light of the arrest, county counsel, on behalf of DPSS, requested a continuance of the hearing in order to file an amended petition alleging additional grounds for jurisdiction as to mother. The trial court granted the request and continued the jurisdictional hearing to November 4, 1987, all parties stipulating to the continuance to *775 that date. Numerous additional continuances were requested by the various parties for a variety of reasons, including the fact that mother was in custody awaiting resolution of the murder charge. During the pendency of the section 300 proceeding, DPSS also filed three additional amended petitions, only the last of which, designated the fourth amended petition filed on December 7, 1989, is pertinent here. In addition to alleging jurisdiction under section 300, subdivision (a), as alleged in the original petition, the fourth amended petition also included allegations under subdivisions (b), (f), and (j).
Mother moved to dismiss the fourth amended petition, contending that her nolo contendere plea to child endangerment (Pen. Code, § 273a, subd. (1)) could not support the allegation under section 300, subdivision (f), which provides, "Any minor who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court.... [¶] (f) The minor's parent or guardian has been convicted of causing the death of another child through abuse or neglect."[7] According to mother's motion, under Penal Code section 1016, mother's nolo contendere plea did not constitute a conviction and, further, could not be used against mother in the section 300 proceeding. Additionally, mother argued that "the specific language of ... section 300(f) was obviously intended to apply to a parent or guardian who was convicted of either murder or manslaughter in the death of a child," thus, mother's conviction for child endangerment, an offense which does not include "death" as an element of the crime, could not be used to support a finding of jurisdiction or dependency under section 300, subdivision (f). The trial court denied mother's motion to dismiss, concluding that mother's conviction for child endangerment under Penal Code section 273a "can be used to find an allegation true under [section] 300(f)."
The jurisdiction hearing on the fourth amended petition occurred on January 26, 1990. The parties submitted the issue of jurisdiction, based on the factual allegations set out in the petition, after county counsel dismissed the section 300, subdivision (b) allegation as to mother. The trial court made true findings as to the remaining allegations, which included the allegation under section 300, subdivision (f) that mother "has been convicted of causing the death of another child through abuse or neglect, in that: [¶] ... mother ... was convicted on January 12, 1988 on Penal Code Section 273 A-1, Child Endangerment, a felony involving the death of [Jessica's] sibling, Matthew...." Thus, the trial court found, as to mother, that Jessica came within the provisions of section 300, subdivisions (a), (f) and (j), as alleged in the fourth amended petition.
*776 A contested disposition hearing began on March 15, 1990, and continued for four nonconsecutive days, concluding on April 4, 1990. The evidence, the details of which shall be discussed as pertinent, below, consisted of social worker's reports, including attachments and exhibits, dated January 25, 1990, and March 15, 1990, mother's cross-examination of the social worker who prepared the report and mother's own testimony. On April 11, 1990, the trial court, among other things, declared Jessica to be a dependent child of the court, placed Jessica in the custody of DPSS and ordered that Jessica be maintained with mother's cousin. In addition, the trial court terminated visitation between Jessica and mother, finding that continued visitation would be detrimental and not in the best interest of the child, although the trial court was of the view that a final, closure visit might be appropriate. The trial court further found that reasonable efforts had been made to prevent or eliminate the need for removal of Jessica from mother's home and that section 361.5, subdivision (b)(4)[8] applied, such that DPSS need not provide additional reunification services to mother because mother had been "convicted of causing the death of another child." Thus, the trial court ordered that Jessica be removed from mother's custody, finding "beyond any reasonable doubt that reasonable services were offered to mother."

I.

DOES MOTHER'S CONVICTION UNDER PENAL CODE SECTION 273A, SUBDIVISION (1) CONSTITUTE A CONVICTION WITHIN THE MEANING OF SECTIONS 300, SUBDIVISION (F) AND 361.5, SUBDIVISION (B)(4)?
(1) We first address mother's assertion that her conviction under Penal Code section 273a, subdivision (1) for child endangerment is not a conviction for "causing the death of another child through abuse or neglect," therefore, the trial court's finding of dependency under section 300, subdivision (f) was not supported by substantial evidence and the trial court's finding under section 361.5, subdivision (b)(4) was improper. According to mother, a conviction under Penal Code section 273a, subdivision (1) does not include physical injury, least of all death, as an element of the crime. Consequently, such a conviction cannot sustain a finding under section 300, subdivision (f) which provides, "Any minor who comes within any of the following descriptions is within the jurisdiction of the juvenile court which *777 may adjudge that person to be a dependent child of the court.... (f) The minor's parent or guardian has been convicted of causing the death of another child through abuse or neglect."[9]
If we were to accept mother's assertion that "death" of a child must be an element of the crime for which she was convicted, we would necessarily have to conclude that the Legislature intended subdivision (f) to apply only when the parent or guardian was convicted of murder or manslaughter. We are of the view that the Legislature did not intend such a narrow application of section 300, subdivision (f) for several reasons. First, had the Legislature intended to limit jurisdiction and dependency under subdivision (f) to homicide convictions, it could have said so in plain, unequivocal language. Instead, the Legislature has stated that jurisdiction and dependency may be based upon a finding that the parent "has been convicted of causing the death of another child through abuse or neglect." In other words, the express language of section 300, subdivision (f) militates against mother's interpretation.
Secondly, in 1987 the Legislature completely revised section 300, making numerous substantive changes, including the addition of subdivision (f). As part of the statutory revision, the Legislature set out a statement of its intent, including the statement that, "It is the intent of the Legislature in enacting this section to provide maximum protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to protect children who are at risk of that harm." (§ 300.)
If the general purpose and intent of the 1987 revision of section 300 is to provide "maximum protection for children," then we must interpret subdivision (f) in a manner consistent with that intent and purpose. Thus, we are of the view that the Legislature, by its use of the above noted broad language, intended subdivision (f) to include any conviction arising out of a criminal proceeding initiated against a parent based upon the fact that the parent caused the death of a child through abuse or neglect.[10] In other *778 words, where the parent or guardian is convicted of a crime other than murder or manslaughter, the facts and circumstances underlying the criminal prosecution of the parent or guardian must include the death of another child as the result of abuse or neglect of the parent or guardian. Thus, when a parent or guardian in some way participated in an act or acts which resulted in the death of a child, and, further, where the parent or guardian, as the result of that participation, is convicted of a crime other than murder or manslaughter, the trial court, in making a finding of jurisdiction and dependency under subdivision (f), must look behind the bare fact of the conviction to the actual facts and circumstances which gave rise to the initial criminal prosecution.
The trial court here did look behind mother's conviction, based upon her plea of nolo contendere to child endangerment under Penal Code section 273a, subdivision (1), and determined that mother caused the death of Matthew through abuse or neglect. Specifically, mother, as previously noted, submitted the issue of jurisdiction based on the allegations of the petition and the social worker's report. The trial court, in making its true finding under section 300, subdivision (f), read and considered the social worker's report which revealed not only that mother's conviction for child endangerment was the result of a plea bargain in a criminal proceeding in which mother was originally charged under Penal Code section 187 for the murder of her son, but also revealed the facts and circumstances surrounding Matthew's death. The police and autopsy reports, as above noted, were included as attachments to the social worker's report and thus, also were before the trial court for consideration. Based on the foregoing evidence, the trial court found the section 300, subdivision (f) allegation to be true. We conclude, therefore, that substantial evidence supports the trial court's finding of the truth of the allegation under section 300, subdivision (f) that mother "has been convicted of causing the death of another child through abuse or neglect."
At the disposition hearing, the trial court denied reunification services to mother, on the ground, among others, that section 361.5, subdivision *779 (b)(4)[11] applied. Mother, in challenging the trial court's order denying reunification services, reiterates her trial court contention, previously discussed, that her conviction for child endangerment cannot support the denial of reunification services under section 361.5, subdivision (b)(4). Mother further contends that (1) the trial court committed reversible error in denying reunification services based on its conclusion that it was without authority or power to order such services because more than 18 months had passed since the initial detention; (2) rule 1456 of the California Rules of Court requires DPSS to specifically allege, in the section 300 petition, that reunification services should not be ordered under section 361.5, subdivision (b)(4); and (3) mother, in accordance with the requirements of rule 1456(e) of the California Rules of Court, presented evidence sufficient to establish, by a preponderance of the evidence, that reunification services were likely to prevent reabuse.
We have already addressed, and rejected, mother's argument that her conviction under Penal Code section 273a, subdivision (1) cannot support the trial court's finding under section 300, subdivision (f). We shall not address that contention again except to note that the trial court's finding was supported by substantial evidence. Mother's remaining contentions, likewise, are without merit. (2) The trial court denied reunification services to mother under section 361.5, subdivision (b)(4) which, as noted above, provides that reunification services need not be provided when the court finds by clear and convincing evidence that a parent has been convicted of causing the death of another child through abuse or neglect. Having made the required finding under section 300, subdivision (f), and, thus, denying reunification services under section 361.5, subdivision (b)(4), the trial court could not order reunification services unless, under section 361.5, subdivision (c), the trial court found, "... based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent."
In addressing the question of whether to provide reunification services, the trial court first did state that it was without authority to grant or order further reunification services because 18 months had expired since the original detention. Although this statement is incorrect, we shall not belabor the point here because the trial court also stated, "The next separate and distinct rationale for declining to offer or not offering reunification services to mother is I do find specifically that section 361.5, subdivision (b)(4) does *780 apply. Being triggered by a [section] 300, subdivision (f) finding, this mother was convicted of causing the death of another child through abuse or neglect. Certainly, this child endangerment is negligence at least, if not the most incredible form of abuse. Acknowledging the fact that mother is caught up in a psychological form of denial, it isn't surprising, but nonetheless, it needs to be asked[,] what did mom think that she was sentenced for [on her plea to child endangerment]? A year [in county jail] for the picking of a bad baby sitter? No. I have no reasonable doubt that this mother did not (sic) kill her son Matthew.[[12]] [Although] some of the comments were made during final argument, ... I need to make this record clear that mother has not been candid with us and, in fact, lied to us repeatedly. I have noted and carefully watched her body language[,] demeanor, her voice inflections, the flat facial and vocal affect while crying, her lifeless eyes which were inconsisten [sic] with her ... spoken words or ... facial expression. On top of this, of course, we have acknowledged correctness by mom of the police and the coroner's reports and yet her indication to us that they are wrong when they say it is impossible for the minor [Matthew] to be found as [mother] claims. It's been commented on, and I share the concern[,] that mother was so late in possibly accusing [the baby sitter], and that whole process of accusing [the baby sitter] is bazarre [sic]. [Mother] further indicates to me that she would not talk to the police because they were not nice to her."
The trial court then went on to address section 361.5, subdivision (c), noting, in effect, that the burden of proof shifts to the parent to show "by competent testimony that reunification services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." The trial court then stated, "I specifically do find by clear and convincing evidence that [mother] has not met her burden of proof ... [¶] Additionally, I do find that any reunification services to mom are not likely to be successful. And failure to order those services would not be detrimental to the child. In fact to the contrary, I find that not providing services would be to this minor's best interests. And, in fact, providing services would be to the minor's detriment."
Mother's argument focuses almost exclusively on showing that she met her burden of proof on the issue of whether reunification services were *781 likely to prevent reabuse. The pertinent provision of section 361.5, subdivision (c), set forth above, is framed in the alternative, requiring the trial court to deny reunification services unless it is shown, by competent testimony, that such services "are likely to prevent reabuse or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." Thus, we shall not discuss the sufficiency of mother's showing on the reabuse issue, although we disagree with mother's argument,[13] because the trial court also found, as above quoted, that failure to order reunification services not only would not be detrimental to Jessica but also that ordering such services would be detrimental.
Mother's argument regarding detriment to Jessica if reunification services were not provided is limited to the single statement that "mother and Jessica were establishing a bond through the gradually increasing supervised visitation." In fact, the evidence is to the contrary. The previously noted social worker's reports, which were the only competent evidence presented on this issue,[14] revealed that visitation between mother and Jessica did not begin until February 1989. Thus, from March 6, 1987, when Jessica was less than eight months old and removed from mother's custody, until February 1989, Jessica did not have any contact with mother. Despite nearly a year of increasing visitation between mother and Jessica, the social worker noted that, "The interaction between the minor and her mother appears to be one of ease, however, the minor does not know [mother] as her mother, but refers to her [by mother's first name.] The undersigned does not see any bonding between the minor and her mother; however, the minor's mother's therapist, ... reports `there appears to have developed a bonding between [mother] and Jessica which is apparent by the way that the child greets her mother and the ease with which she relates to her.'" Additionally, the social worker's supplemental report, which addressed only the "justification" for not providing reunification services, included a *782 brief description of the interaction between mother and Jessica during supervised visitation, and concluded, "The relationship between the minor and her mother appears relaxed and comfortable, but not bonded and close." Mother, in our view, did not offer any competent evidence to show that Jessica had any connection with mother other than as a friend. The trial court, therefore, properly denied reunification services to mother under sections 361.5, subdivisions (b)(4) and (c).
Finally, mother incorrectly asserts that denial of reunification services under section 361.5, subdivision (b)(4) can only occur if DPSS specifically alleges in the section 300 petition that such services should be denied. We first note that mother does not, and cannot, claim that she did not have notice that reunification services might be denied under section 361.5, subdivision (b).[15] Instead, mother cites rule 1456(e)(7) of the California Rules of Court, which states, "When it is alleged that reunification services should not be ordered under sections 361.5(b)(3), (4) or (5), the court shall not order reunification services unless it finds by a preponderance of the evidence that the services are likely to prevent reabuse or neglect or that failure to attempt reunification will be detrimental to the child." Thus, mother is apparently of the view that use of the word "alleged" in rule 1456 requires DPSS to include an appropriate allegation in the section 300 petition. We disagree with mother's assertion. Rule 1456(e) merely implements the provisions of section 361.5, which, in subdivision (c) specifies in pertinent part, that, "In deciding whether to order reunification in any case in which this section applies, the court shall hold a dispositional hearing. The probation officer shall prepare a report which discusses whether reunification services shall be provided...." In our view, section 361.5 only requires that mother be given notice in the social worker's report that reunification services might be denied and, further, that mother be afforded an opportunity to be heard on that issue, both of which occurred in this case.

II-IV[*]
.... .... .... .... .... .

*783 CONCLUSION
Mother, as pointed out by the trial court, has refused to accept anything more than minimal responsibility for the death of Matthew, despite, what in our view, is significant, if not overwhelming, evidence which directly implicates mother in the strangulation death of her son. Consequently, at the disposition hearing the trial court was faced with the prospect of returning Jessica to a mother who may have killed her own son but who was unwilling or unable to overcome her denial to provide any credible explanation regarding the death. In short, mother asked the trial court either to ignore the evidence or take a blind leap of faith that mother would not repeat her actions. The issues raised by mother in this appeal make a similar request of this court. We are of the view that each of the findings and orders attacked by mother either was proper and supported by substantial evidence or, if in error, the error was harmless.

DISPOSITION
The judgment is affirmed.
Hollenhorst, Acting P.J., and McDaniel, J.,[**] concurred.
Appellant's petition for review by the Supreme Court was denied July 10, 1991.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The parts to be published follow.
[1] Pursuant to California Constitution, article VI, section 21.
[2] Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.
[3] According to the statement mother gave to the police two days after Matthew's death, mother actually returned home briefly after approximately two hours. Mother initially stated that she checked on Matthew during her brief return home and Matthew was still sleeping. Mother, apparently on the advice of her attorney, later sent a letter to the police admitting that she did not check on Matthew during her initial return home, but in fact, did not check on him until returning home the second time.
[4] Mother apparently tied the cord on the pacifier so that Matthew could wear the pacifier like a necklace, keeping the pacifier within the child's reach if it fell from the child's mouth.
[5] The alleged natural father, who is not a party to this appeal, was also the alleged natural father of Matthew, although not married to mother nor living with mother and the children at the time of Matthew's death. Apparently father was unable or unwilling to take temporary custody of Jessica for several reasons, including that he did not have a suitable place to reside with a child.
[6] All further citations are to the Welfare and Institutions Code unless otherwise indicated.
[7] The petition also included allegations pertaining to Jessica's alleged father, none of which are pertinent to this appeal by mother.
[8] Mother remained in custody after her arrest on the Penal Code section 187 charge, and in January 1988, pursuant to a plea agreement, pled no contest to one felony count of child endangerment (Pen. Code, § 273a, subd. (1)). The criminal court sentenced mother to serve one year in county jail as a condition of probation. Mother was released from jail in June 1988.
[9] Mother did not challenge the allegations under subdivisions (a), (b) or (j) of section 300 in her motion to dismiss.
[10] Section 361.5, subdivision (b)(4) provides, in pertinent part, that the reunification services required under subdivision (a), when a minor is removed from a parent's custody, "... need not be provided to a parent described in this subdivision when the court finds by clear and convincing evidence, ... [t]hat the parent of the minor has been convicted of causing the death of another child through abuse or neglect."
[11] Mother notes that the trial court also rejected her argument, under Penal Code section 1016, that her plea of nolo contendere could not be used against her, and thus, did not constitute a "conviction" for purposes of section 300, subdivision (f). Mother does not expressly reassert that argument in this appeal. However, to the extent mother intended the foregoing comment as a reassertion of the argument raised in the trial court, we reject the assertion. In raising this argument in the trial court, mother apparently overlooked the express language of Penal Code section 1016 which provides, in pertinent part, that, "The legal effect of ... a plea [of nolo contendere], to a crime punishable as a felony shall be the same as that of a plea of guilty for all purposes." (Italics added.)
[12] Further support for this conclusion is found in the report of the Senate Select Committee on Children and Youth, Senate Bill 1195 Task Force on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan. 1988) which "documents the intent" of legislation, including Senate Bill No. 243, 1986-1987 Regular Session, pursuant to which the 1987 revision of section 300 was accomplished. According to that report, "The reason for revising Welfare and Institutions Code Section 300 is to provide more clear-cut guidance to social workers and judges regarding the types of situations which the Legislature considers abusive or neglectful." Although the report does not address subdivision (f) of section 300 specifically, it is noted that, "Underlying SB 243 is the judgment that court intervention is not appropriate unless there is good reason to believe that the parent's conduct towards the minor constitutes a significant threat to the minor's physical or emotional well being. The harm must be reasonably `serious.'" (Sen. Select Com. on Children and Youth, Rep. of Sen. Bill 1195 Task Force on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services, supra, at pp. 3, 5.) Thus, the revisions to section 300 identify particular conduct of the parent and the threat of harm that conduct poses to the physical or emotional well being of the minor. Under subdivision (f), that conduct is specified as abuse or neglect by the parent which causes the death of a child.
[13] As previously noted, section 361.5, subdivision (b) provides that, "Reunification services need not be provided to a parent described in this subdivision when the court finds, by clear and convincing evidence, any of the following: ... [¶] (4) That the parent of the minor has been convicted of causing the death of another child through abuse or neglect."
[14] The words "not (sic)" appear in the reporter's transcript, indicating to this court that the reporter was of the view that the trial court apparently misspoke when it stated, as noted above, that this mother did "not" kill her son. From our review of the trial court's comments, considered in their entirety, we are of the view that the trial court did, in fact, use the negative "not" inadvertently, intending, instead, to say, "I have no reasonable doubt that this mother did kill her son Matthew."
[15] As previously noted, mother testified at the disposition hearing. During cross-examination, mother stated that while she originally thought Matthew's death was an accident, she changed her mind after reading the police reports and concluded that the baby-sitter, or possibly some one the baby-sitter might have let in the house, killed Matthew. Thus, despite all evidence to the contrary, as noted above, by the trial court, mother continued to deny any involvement in the death of Matthew, acknowledging only that she was negligent in failing to make sure that the baby-sitter knew about the medications Matthew was taking and further, in failing to check on Matthew during the times mother returned home from shopping. Although there was no evidence that mother had ever actually abused Jessica, mother's inability or refusal to accept anything other than minimal responsibility for the death of her son is an excellent indicator that reunification services were not likely to prevent future abuse.
[*] In support of the foregoing statement that mother and Jessica were "establishing a bond," mother cites this court to hearsay statements made during the disposition hearing by the social worker on cross-examination by mother's attorney. Specifically, the social worker, over objection by counsel for DPSS and Jessica, was recounting statements made to the social worker by mother's therapist.
[**] Each of the social worker's combined jurisdiction and disposition reports prepared in this action included the recommendation that the court "[f]ind that 361.5(b) may apply and Reunification Services may not be ordered." Thus, as early as November 4, 1987, when the first social worker's report was filed, mother had notice that such services might be denied. In addition, at the jurisdiction hearing on January 26, 1990, at which mother and her attorney were both present, county counsel, on behalf of DPSS, specifically pointed out the foregoing recommendation in the January 25, 1990, report and, further, asked the court to amend the recommendation by adding subparagraph (4) after 361.5, subdivision (b). Thus, the report, as amended at the jurisdiction hearing, specified that reunification services might be denied under section 361.5, subdivision (b)(4).
[] See footnote, ante, page 769.
[] Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.